## THE R. D. BIBBER.

GALVESTON STEAMSHIP & LIGHTER Co. *v.* THE R. D. BIBBER and Cargo.

*(Circuit Court, E. D. Texas.* December 5, 1887.)

1. SALVAGE—GOOD FAITH OF LIBELANT—INTEREST.
    A partner in a firm to whom a schooner was consigned was also interested in a lighter company, the libelant, who claimed salvage on the schooner. *Held,* that his interest in no way affected the good faith or right of the libelant to recover.

2. SAME.
    A person had contracted to discharge the cargo of a vessel, outside or at the wharf, for a stipulated price; after the work had been begun, the vessel was driven ashore. *Held,* that his previous contract did not affect his right to claim salvage for services on the same cargo after the wreck.

3. SAME—RIGHT OF LIBELANT—NON-JOINDER OF PARTIES.
    A libelant employed men, and paid liberally to render salvage services. *Held,* that libelant was entitled to compensation, and the amount should not be reduced on the claim that the persons employed by them were entitled to compensation. They should join in the suit or make claim to the proceeds, if any are in the registry of the court.

4. SAME—COMPENSATION—ONE-HALF SALVAGE.
    A schooner loaded with railroad iron went ashore in Galveston bay. The vessel and cargo were salved by libelants under a contract with the master for 50 per cent. of the value; wrecking crews were paid extra sums, and pumps of large cost for that locality used, and the vessel and cargo saved at the risk of serious damage to the property engaged in the work of salvage, one of the lighters being injured, and the crews suffering much hardship, and the weight of the evidence showing that the cost of saving railroad iron wrecked on the gulf beach, on basis of work and labor, is 50 per cent. of its value. *Held,* that the contract was reasonable, and a proper allowance for salvage would be 50 per cent. of the value of the property salved.

In Admiralty.

*McLemore & Campbell,* for libelant and appellee.

*Waul & Walker,* for Mifflin Kennedy, claimant of the cargo, appellant.

PARDEE, J. This cause came on to be heard upon the appeal of Mifflin Kennedy, claimant of the cargo, and was argued; whereupon the court finds from the evidence the following, as the facts in the case:

(1) The libel is filed by the Galveston Steam-Ship & Lighter Company, a private corporation, whose business was, at and before the filing of the libel, to carry on the lighterage and towage business in the waters around the port of Galveston, and the said company was well equipped for such business; and said company was, at the time of the services rendered as stated in the

libel, well equipped for the purpose of rendering aid and assistance to stranded vessels in distress around the port of Galveston; and said company had provided itself with steam-tugs, and expensive wrecking pump, with a view of saving vessels and their cargoes that might be stranded off Galveston harbor.

(2) On the nineteenth day of January, 1887, the schooner R. D. Bibber, while being towed into Galveston harbor, ran aground on the Texas coast, about seven miles from the city of Galveston, with a cargo on board of about 700 tons of steel rails, such as in general are used by railroads.

(3) The said schooner, Bibber, drew about 13 feet and between 4 and 10 inches when she struck the bottom, on the nineteenth day of January, 1887; and she was driven by the sea and wind, during the afternoon of that day, further onto the beach, into about seven feet of water, at a point called "Bird Island;" and as she lay, on January 20, 1887, she was partially buried in the quicksand, and powerless to extricate herself.

(4) On January 19th the master of the schooner R. D. Bibber, finding that his vessel was aground and not able to be relieved by the steam-tug Ivy, that was towing her into the port of Galveston under the directions of a pilot, nor by the steam pilot-boat that went to his assistance, left his vessel, and went into the city of Galveston to seek assistance.

(5) The master remained in Galveston all day of the twentieth of January, and until the morning of the 21st; and, during his sojourn there, at the the suggestion of his ship's agent he made known to the libelants herein the condition of the R. D. Bibber, and invited the officers of the said libelants, the Galveston Steam-Ship and Lighter Company, to make a proposition, or propositions, as to relieving the schooner and cargo from their sunken condition. The officers of the company declined to make any proposition, or to agree to any terms of salvage, at the time, alleging that they were ignorant of the true condition of things.

(6) The libelants were advised, on the afternoon of the nineteenth of January, that the schooner was in distress and aground where she was on the coast, and employed a man skilled in such matters (Charles Clarke) to proceed as soon as possible to the locality of the Bibber for the purpose of ascertaining the extent of the trouble, and to report, without delay, the true condition to libelants.

(7) On the morning of the twentieth of January, Charles Clarke, as the employe of the libelants, and at their instance, went out with a number of seamen to the scene of trouble, and made observation of the situation, and without delay returned and made report to the libelants as instructed.

(8) The libelants at once ordered Clarke and his men (about six) to proceed with all haste to the schooner, with a tug and such appliances as were needed to relieve the sunken schooner. And Clarke and his six men went out, on the evening of the twentieth of January, to the Bibber, and at once went to work with skill and zeal to relieve the schooner.

(9) On the same day, and at a late hour of the day, (twentieth of January,) the master of the schooner and the agent of the underwriters on the cargo of the schooner Bibber, went to the office of libelants to renew the request upon the libelants to submit propositions or terms upon which the libelants would undertake to save the schooner and her cargo. And thereupon propositions or terms were submitted for the consideration of the master and agent of the underwriters, as follows:        "GALVESTON, TEXAS, January 20, 1887.

"*Capt. B. E. Pinkham, Schooner R. D. Bibber, stranded on the bar—*
SIR: We will undertake to salve your vessel and her cargo on the following terms: *First proposition.* We will do the entire work at our own risk and expense, charging $\frac{1}{2}$ of the value of the property saved for our services. *Second proposition.* We will hire to you, *for six days,* our '14-inch suction' wrecking pump, for the sum of one thousand dollars, and one hundred dol-

lars for each day after the first six days, you paying all expenses; and we will hire you one of our lighters for the sum of two hundred dollars per day, you paying all expenses.

"If you accept our second proposition, we will require that you furnish us good security for the safe return of pump and lighter to the wharf, in same condition as delivered to you, usual wear and tear excepted.

[Signed] "B. Adone, Agt. Gal. S. S. & Lighter Co."

(10) After the master had taken time to discuss the proposition with the insurance agent and others, and after both the master and insurance agent had visited the scene of the disaster on the twenty-first of January, in order to acquaint themselves with the situation of the Bibber and the hazards of the undertaking to save the vessel and cargo, and after the transmission to, and receipt of telegrams by, the insurance agent from his principals, the master accepted in writing the proposition to allow libelants 50 per cent. of all the property saved by libelants of schooner Bibber and her cargo.

(11) The master and his two mates, and all of the crew of the Bibber, left the schooner on the twentieth day of January, 1887, and the only person of the officers and the crew that returned afterwards to the vessel during her distress and days of trial, to remain or work, was the second mate, who returned on the evening of the twenty-second of January. The master visited the schooner nearly every day, but remained only a short time, and left Charles Clarke and his men, as employes of libelants, *in charge of the schooner Bibber and cargo*. The master and his crew left the schooner, and remained absent, because they did not care to undergo the hardships and hazards to which they would have been exposed if they had remained on board the Bibber; and such of them as did return to her, except one, went because the hardships and hazards no longer threatened them.

(12) The libelants and their employes, from the twentieth of January to the 24th, inclusive, in salving the Bibber and cargo were prompt, energetic, skillful, and courageous. They employed, at different times during this period, four steam-tugs of great power and large value, with extra crews of men, and a wrecking pump of extraordinary capacity and large cost for that locality. The employes of libelants were paid by libelants, besides their regular wages, large amounts of money, as reward and compensation for their services in saving the schooner Bibber and cargo; not less than $3,000 having been paid to the employes as extra wages, including $1,200 to Charles Clarke, and $100 each to the men employed on the schooner,—about 16 in number.

(13) The schooner Bibber and cargo were saved at the risk of serious damage to the property engaged in the work of salvage, which property was worth about $75,000 or $80,000, including the Buckthorn, that was employed by libelants at the risk of libelants. The employes of the libelants, acting for libelants as the salvors, displayed, throughout the several days of their employment, conduct of great merit; they were prompt, skillful, and courageous, and they endured hardships, and underwent hazards to their health and lives, in the service rendered by them. One of the lighters employed by libelants was materially damaged in the service. The schooner Bibber was rescued from total loss, and the cargo of the Bibber from a beached and sunken condition, by the efforts of libelants, and such loss was imminent when the efforts were begun.

(14) The schooner Bibber was consigned to Moeller & Co., as ship's agents, and the cargo of steel rails to M. Kennedy, claimant herein. The firm of Moeller & Co. was composed of J. Moeller and T. H. Sweeney, the latter of whom was a stockholder in and secretary of the libelant company.

(15) Charles Clarke, the managing employe of the libelant company in effecting the salvage of the Bibber and cargo, had contracted with the master

of the schooner while she was outside and before she was stranded, to discharge the cargo of steel rails outside and at the wharf for 30 cents per ton, and in pursuance thereof had discharged about 70 tons while the schooner was outside.

(16) M. Kennedy, the consignee of the cargo, was represented in Galveston by Messrs. Parker and Campbell, neither of whom was consulted as to the contract between the master and the libelant company as to salvage.

(17) Considering the condition of the schooner and her cargo, the circumstances under which the contract for salvage was made, and the risk of total failure taken by the libelant as to the ship, the contract for one-half of the value of the property salved was reasonable, and, so far as the master had authority to make it, should be recognized and sustained.

(18) As a general rule, steel rails in a wrecked vessel on the beach near Galveston are not subject to total loss, but they are at risk, and are subject to damage, and the general expense of saving them is about 50 per cent. of their value.

(19) The services of the libelant company, and its vessels and appliances and employes, in salving the cargo of the Bibber, were salvage services; and, whether measured by the contract aforesaid, or allowed by the court on the merits, were worth, and should be compensated by, an allowance of 50 per cent. of the value of the property salved.

(20) The schooner Bibber settled the claim against her after the seizure by paying 50 per cent. of an apparently fair valuation, and no claim is now asserted on this trial.

(21) The *cargo* saved by the libelants was made up of steel rails, on board of the Bibber at the time she went aground, being about 700 tons; which cargo was saved by libelants, partly by taking same out of the schooner, in order to enable the libelants to take the schooner off the ground, and partly by saving the schooner, so as to bring her into the harbor, and to the wharf in the city of Galveston, with a portion of the steel rails in the vessel.

(22) The cargo thus saved by libelants was worth, at Galveston, the sum of $25,000 on the fifth day of February, 1887, the day on which the libel in this suit was filed, and on the twenty-fourth day of January, 1887, when the salvage was complete; and the proper allowance for salvage therefor is the sum of $12,500, with damages for delay since the decree of the district court, July 16, 1887.

(23) The record and proof in this case show that the cargo of the schooner Bibber was seized by due process in admiralty, and was duly claimed by Mifflin Kennedy, with sureties on his bond for $20,000, Julius Kauffman and Julius Runge signing as sureties. And after judgment as against said Kennedy and his sureties in the district court, the record and proof show that an appeal was taken from the judgment of the district court to the circuit court of the United States by said Mifflin Kennedy and Julius Kauffman and Julius Runge as principals, with J. H. Hutchings and J. G. Goldthwaite as sureties, on a bond of $20,000, and conditioned to pay off and satisfy such judgment as the circuit court might render in the premises.

And the court finds as conclusions of law:

(1) That the interest of Sweeney, partner in the firm of Moeller & Co., consignees of the schooner Bibber in the libelant company, does not affect the good faith or right to recover of the said company for salvage services rendered by said company to the cargo of the said schooner Bibber. *Hobart* v. *Drogan,* 10 Pet. 108, and cases there cited. Also, see chapter 2, Jones Salv., and Abb. Shipp. 360 *et seq.*

(2) That Charles Clarke's previous contract to discharge the cargo of the Bibber outside or at the wharf at a stipulated rate, does not affect his right

to claim salvage for salvage services on the same cargo when afterwards the cargo was wrecked and the services rendered. See same authorities.

(3) That the libelant company, having employed men and paid liberally, and employed machinery to render salvage services, and having in this way rendered salvage services, is entitled to recover salvage compensation, and the amount thereof should not be reduced on the objection of claimants that others, the persons so employed, are entitled to share in the compensation. The remedy of such others, if they have complaint or have not been liberally compensated, is to become parties to the suit, or to make claim against the proceeds, if any are in the registry of the court. See *The Camanche*, 8 Wall. 448; *The Blackwall*, 10 Wall. 1.

(4) The libelant company should have a decree against the cargo of the schooner Bibber, to-wit: About 700 tons of steel rails, for salvage in the sum of $12,500, and against Mifflin Kennedy, claimant, and Julius Runge and Julius Kauffman, sureties on the release bond *in solido*, condemning them to pay the amount of the decree against the said cargo, with interest thereon at 8 per cent. per annum, from July 16, 1887, and all costs heretofore adjudged against them by the decree of the district court of July 16, 1887, and all costs of this court; and against J. H. Hutchings and J. G. Goldthwaite, sureties on the appeal-bond, condemning them jointly and severally to pay and satisfy the decree herein to be rendered against said M. Kennedy, Julius Runge, and Julius Kauffman.

There is nothing in the evidence to show that the Bibber was put aground through any negligence of the tug, Ivy, nor even of the pilot. The evidence rather shows that the fault was the master's, in misstating the draft of the Bibber. I do not find any evidence that Moeller was interested in the Galveston Steam-Ship & Lighter Company. It is immaterial, however, as his partner Sweeney was. Neither Sweeney, as agent of the Bibber, nor Clarke, as contractor to unload the Bibber, was charged with any duty to the cargo of the Bibber, after the Bibber was stranded, that rendered them incompetent to claim as salvors of the Bibber's cargo, if they thereafter rendered salvage services.

There is not sufficient evidence to warrant any finding that the lighter company or its officials acted otherwise than in good faith, or took any undue advantage of the master of the Bibber. What the company did was open, and the master could see for himself. He could have seen better if he had stayed by his ship.

This case differs materially from that of *The Hesper*, 18 Fed. Rep. 692. The Hesper was a steam-ship, aground in fair weather, under the control of her master and crew, who did not abandon her to salvors, and the services rendered her were at the procurement of the ship's agents. The salvage of the Hesper was due as much to her machinery and her master and crew, as to the services of the lighters and tugs called to her aid.

By the weight of evidence in the record, the cost of saving railroad iron wrecked on the gulf beach on the basis of work and labor, is 50 per cent. of its value. The salvage of the cargo of the Bibber cannot be said to have been due until decreed by the admiralty court. As a general rule one-half of the value of the property salved is the maximum salvage. I have therefore allowed damages, in the way of interest from the date of the decree in the district court.

I have not found the detailed facts as to the weather and the services of the men and boats employed in salving the Bibber and cargo, because the ship was abandoned to the salvors, and it is conceded that the services rendered were salvage services, and the amount of salvage claimed and allowed does not exceed, to any great extent, the actual cost for work and labor to salve wrecked railroad iron.

### DECREE.

Considering the foregoing conclusions of fact and law, it is ordered, adjudged, and decreed that the libelant, the Galveston Steam-Ship & Lighter Company, be awarded salvage on the cargo of the schooner Bibber, to-wit: On about 700 tons of steel rails, libeled herein, in the sum of $12,500 as of date July 16, 1887, and that Mifflin Kennedy, claimant, and his sureties on the release bond, Julius Runge and Julius Kauffman, be condemned, *in solido*, to pay said award of salvage, to-wit: The sum of $12,500, with 8 per cent. per annum interest thereon, from July 16, 1887, until paid, together with all costs of the district court as adjudged, by decree of July 16, 1887, and all costs of this court to be taxed. And it is further ordered, adjudged, and decreed that J. H. Hutchings and J. G. Goldthwaite, sureties on the appeal bond to this court, be condemned, jointly and severally, to pay and satisfy the aforesaid decree against Kennedy, Runge, and Kauffman, together with costs as aforesaid. And, after five days from notice of filing this decree, execution may issue.